# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **BKB PROPERTIES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:08-cv-00529** |
| | ) | **Judge Trauger** |
| **SUNTRUST BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion to Dismiss (Docket No. 8), to which the plaintiff has responded (Docket No. 17), the defendant has filed a reply (Docket No. 21), and the plaintiff has filed a sur-reply (Docket No. 26). For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

In early 2002, the plaintiff, BKB Properties, LLC ("BKB"), and the defendant, SunTrust Bank ("SunTrust"), negotiated with respect to the financing for construction at property located at 630 Bakers Bridge Avenue in Franklin, Tennessee.[1] Those negotiations resulted in a loan agreement and an interest rate swap agreement, both of which were memorialized in a number of documents.[2]

---

[1]Unless noted otherwise, the facts are drawn from the Complaint. (Docket No. 1 Ex.)

[2]A key issue in resolving the defendant's motion to dismiss, which will be addressed herein, is whether these agreements constitute a single transaction or two discrete transactions.

1

Among the relevant documents is a Construction Loan Agreement, dated March 12, 2002 (the "Loan Agreement"), pursuant to which SunTrust agreed to lend BKB money to finance construction at the Bakers Bridge Avenue property.  (*See* Docket No. 1 Ex., Ex. A.)  The term of the loan was twenty years, although BKB was permitted to prepay the loan, at any time, "without penalty or premium."  (*Id.* § 2.4.)  A Construction Note (the "Note"), which was referenced by and issued pursuant to the Loan Agreement, required BKB to pay interest on the loan at a variable rate.  (*See* Docket No. 1 Ex., Ex. B.)  The Note additionally provided that BKB had "an absolute right to call this Note during the months of March 2007, March 2012 and March 2017."[3]  (*Id.* at 2.)

During the course of the negotiations, BKB indicated to SunTrust that it wished to obtain a fixed interest rate for the loan rather than a variable rate, and SunTrust advised that this could be accomplished through a so-called "swap agreement."[4]  According to BKB, a SunTrust

---

[3]Contrary to the common parlance, in which a right to call a note refers to a lender's right to demand repayment of a loan, *see Black's Law Dictionary* 204 (6th ed. 1990), the use of the term "call" in this instance refers to BKB's right to prepay the loan.

[4]SunTrust provides the following description of how swap agreements generally function:

An interest rate swap is a contract in which two parties agree to exchange or "swap" cash flows for a specified period of time on a specified amount of principal.  In interest rate swaps typically, and in this case, one party (here, the Plaintiff) agrees to pay interest on the specified amount at a fixed rate of interest set at the inception of the swap, while the other party (here, SunTrust) agrees to pay a floating rate of interest on the same specified amount at a variable rate.  If interest rates rise, then the swap has value to the fixed-rate payer, who has a continuing contractual right to receive payments from the other party at the (higher) floating rate.  Conversely, if interest rates fall, then the swap has value to the variable-rate payer who has a contractual right to receive payments from the other party at the (higher) fixed rate.  If the swap transaction terminates early (either due to the termination of the swap contract pursuant to its terms or by agreement of the parties), then the party to whom the contract has a negative

2

representative indicated that "the only material effect" of the swap would be to fix the interest rate on the loan.  Thus, in addition to the Loan Agreement, on March 12, 2002, the parties entered an ISDA Master Agreement (the "Swap Agreement"), which, in conjunction with a related Schedule to the ISDA Master Agreement (the "Swap Schedule") and a Confirmation of Interest Rate Transaction (the "Swap Confirmation"), provided for the parties to make certain payments to each other on a monthly basis.[5]  (*See* Docket No. 1 Ex., Exs. C-E.)  Specifically, SunTrust was obligated to make monthly payments to BKB based on a variable interest rate on a specified principal amount, and BKB was obligated to make monthly payments to SunTrust based on a fixed interest rate on the same principal amount.[6]  (Docket No. 1 Ex., Ex. E at 2.) The Swap Confirmation included a termination date of March 15, 2012.  (*Id.*)  BKB's obligations under both the loan and the swap were secured by a Deed of Trust.  (*See* Docket No. 11 Ex.)

In early 2004, BKB contacted SunTrust about refinancing the construction loan. According to BKB, SunTrust represented that BKB would have to pay a "substantial penalty" to

---

value must pay to the other party the market value of the swap.

(Docket No. 9 at 1-2; *see also Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2002) (providing overview of swap agreements).)

[5]According to BKB, SunTrust provided the Swap Confirmation after most of the other loan and swap documents had been executed and represented to BKB that the Swap Confirmation was simply a confirmation of the parties' agreement that needed to be executed to finalize the loan.

[6]A characteristic of swap agreements is that this "notional" principal amount never actually changes hands.  *See Thrifty Oil*, 322 F.3d at 1042.  Further, as a practical matter, under the Swap Agreement, the parties netted their respective payments monthly and, thus, the party obligated to make the higher payment in any given month simply paid the other the difference between the two payments.  (Docket No. 1 Ex., Ex. C § 2(c).)

Case 3:08-cv-00529   Document 28   Filed 03/02/09   Page 3 of 21 PageID #: 343

refinance. Thus, BKB waited until March 2007, one of the months in which it had a right to call the Note, and timely notified SunTrust of its intention to permanently prepay the loan and call the Note and the Swap Agreement. SunTrust refused to accept payment, refused to cancel the Swap Agreement, and refused to remove its lien from the property unless BKB paid a "substantial penalty."[7] BKB and SunTrust negotiated in an attempt to resolve this dispute, during which time BKB was unable to refinance the loan and was required to continue paying an interest rate far above the market rate. Subsequently, BKB offered to prepay the construction loan and to pay, under protest, the amounts SunTrust claimed were due under the swap. BKB alleges that SunTrust refused to accept payment and remove its lien unless BKB released any claims it had relating to the Swap Agreement.[8] Ultimately, however, following the institution of this lawsuit, SunTrust agreed to accept prepayment of the Note and BKB's payment, under protest, of the additional "penalty" amounts. (Docket No. 9 at 15; Docket No. 17 at 3.)

## ANALYSIS

The plaintiff brought suit in state court alleging claims of breach of contract and libel of title. The plaintiff additionally alleged, in the alternative, a claim under the Tennessee Consumer Protection Act and a claim of common law fraud. The defendant removed the case to this court and now moves to dismiss the plaintiff's claims pursuant to Rules 12(b)(6) and 9(b) of Federal Rules of Civil Procedure.

---

[7]According to SunTrust, what BKB characterizes as a "substantial penalty" simply constituted the market value of the swap that BKB was obligated to pay under the terms of the Swap Agreement. (Docket No. 9 at 9.)

[8]SunTrust disputes that it refused to accept this offer. (Docket No. 9 at 15 n.6.)

4

## I.      Motion to Dismiss Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56." *Swierkiewicz*, 534 U.S. at 514.

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court readdressed the pleading requirements under the federal rules. The Court stressed that, although a complaint need not plead "detailed factual allegations," those allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1964-65. "The factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S.Ct. at 1965). Further, the Court observed that Federal Rule of Civil Procedure 8(a)(2) does require a

Case 3:08-cv-00529   Document 28   Filed 03/02/09   Page 5 of 21 PageID #: 345

"showing" that the plaintiff is entitled to relief and that this substantive threshold is not achieved by "blanket assertion[s]." *Twombly*, 127 S.Ct. at 1965 n.3.

Although Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading," *see E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964-65 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Accordingly, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965; *see also Swierkiewicz,* 534 U.S. at 508 n.1; *Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer,* 416 U.S. at 236 (a well-pleaded complaint may proceed, even if it appears "that a recovery is very remote and unlikely").

In addition to these standards governing a motion to dismiss under Rule 12(b)(6), the Federal Rules of Civil Procedure provide a heightened pleading standard for claims involving fraud or mistake. Specifically, the rules provide that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The purpose of Rule 9(b)'s particularity requirement is "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1998).

6

With these standards in mind, the court turns to an examination of the plaintiff's claims.

## II.     Breach of Contract

In the Complaint, BKB alleges that SunTrust "breached its obligations under the Construction Loan by refusing BKB Properties' attempt to pay off the Construction Loan without penalty or premium, by refusing to cancel the SWAP agreement, and by refusing to remove its lien from the Property." (Docket No. 1 Ex. ¶ 11.) BKB additionally alleges that SunTrust "breached its obligation of good faith and fair dealing with respect to its contractual obligations." (*Id.* ¶ 12.). SunTrust argues that these claims must be dismissed because BKB has failed to identify any contractual provision that SunTrust breached and has failed to establish a breach of the covenant of good faith and fair dealing. (Docket No. 9 at 8-13.)

Under Tennessee law,[9] a court's task in construing a contract "is to ascertain the intention of the parties based on the usual, natural, and ordinary meaning of the contractual language." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). The court must first determine whether contractual language is ambiguous; if so, the court "applies established rules of construction to determine the parties' intent," which is a question of law. *Id.* at 890. "'Only if ambiguity remains after the court applies the pertinent rules of

_____

[9]SunTrust has raised a choice of law question in its motion. (*See* Docket No. 9 at 6.) The Loan Agreement provides that "[t]he validity and construction of this Agreement and the other Loan Documents shall be governed by and construed in all respects in accordance with the laws of the State of Tennessee" (Docket No. 1 Ex., Ex. A § 10.6), and the Swap Schedule provides that "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine" (Docket No. 1 Ex., Ex. D Part 5.2). However, the Loan Agreement defines "Construction Loan Documents" to include the swap documents, a fact that SunTrust acknowledges (Docket No. 9 at 10; Docket No. 1 Ex., Ex. A § 1.1), and thus those documents fall within the scope of the Loan Agreement's choice of law provision, creating a contradiction between the two choice of law provisions. Nevertheless, this problem presents a question that is purely academic, as SunTrust acknowledges that the outcome is the same under both Tennessee law and New York law. (Docket No. 9 at 8.)

construction does [the legal meaning of the contract] become a question of fact' appropriate for a jury." *Id.* (citing *Smith v. Seaboard Coastline R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)). Moreover, the Tennessee Supreme Court has noted that, "[w]here a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties." *McCall v. Towne Square, Inc.*, 503 S.W.2d 180, 183 (Tenn. 1973) (quoting 17 Am. Jur. 2d *Contracts* §§ 263-65). "Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect . . . so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated." *Id.* Finally, Tennessee law implies a duty of good faith and fair dealing in the performance and enforcement of every contract. *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. App. 1987)). This duty "depends on the individual contract," and courts must "look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable." *Id.*

Under BKB's theory, the swap was part and parcel of the loan transaction, and the swap documents must be interpreted together with the loan documents. According to BKB, the Loan Agreement provided that it could be repaid "without penalty or premium," and, as the swap was part of the same transaction and as its purpose was to fix the interest rate on the Note, any swap payments that BKB was obligated to make after paying the Note constitute a penalty or premium in breach of the Loan Agreement. BKB further alleges that SunTrust wrongfully refused to remove its lien after BKB prepaid the Note.

8

SunTrust does not deny that, under the terms of the Loan Agreement, BKB was entitled to prepay the construction loan without penalty or premium. However, in contrast to BKB's theory, SunTrust asserts that the loan and the swap constituted distinct transactions and that BKB's obligations under the terms of the swap were not affected by its prepayment of the Note. SunTrust argues that, when BKB sought to prepay the Note, that action did not have the effect of eliminating its obligation under the swap either to continue to make swap payments through the swap's March 15, 2012 termination date or to pay SunTrust the market value of the swap in exchange for terminating the swap early. Therefore, according to SunTrust, any payments that BKB was obligated to make under the swap after prepaying the Note did not constitute a penalty or premium prohibited by the Loan Agreement, but merely represented the satisfaction of BKB's separate obligations under the swap. SunTrust further asserts that it was entitled to refuse to remove its lien because the Deed of Trust secured the Swap Agreement and because BKB had not satisfied its obligations thereunder. SunTrust argues that BKB is essentially asking the court to rewrite the Swap Agreement and that the court should decline to do so, as BKB is a sophisticated commercial party that must be held to the unambiguous terms of the agreement.

The threshold dispute between the parties is whether the loan and the swap constitute two distinct transactions, or whether they constitute a single transaction, in which case the agreements must be construed together. The court notes that the Loan Agreement, the Note, the Swap Agreement, the Swap Schedule, and the Deed of Trust are all dated March 12, 2002.[10] SunTrust does not dispute that the parties entered the Swap Agreement "as a hedge" for the purpose of protecting BKB "against an increase in interest rates *under the construction loan*."

_____

[10]The Swap Confirmation, which has an effective date of March 13, 2002, was sent by SunTrust to BKB on March 13, 2002. (Docket No. 1 Ex., Ex. E.)

(Docket No. 9 at 1 (emphasis added).)  Moreover, the Loan Agreement expressly refers to the

Swap Agreement, a fact that SunTrust also acknowledges.  (*Id.* at 10.)  Specifically, the Loan

Agreement defines "Construction Loan Documents" to include

> collectively, each document, paper or certificate executed, furnished or delivered
> in connection with this Agreement (whether before, at, or after the Closing Date),
> including, without limitation, this Agreement, the Note, the Security Documents,
> *any Hedging Agreement*, and all other documents, certificates, reports, and
> instruments that this Agreement requires or that were executed or delivered (or
> both) at Lender's request.

(Docket No. 1 Ex., Ex. A § 1.1 (emphasis added).)  The Loan Agreement defines "Hedging

Agreement," in turn, to include "*any interest rate swap* . . . and other similar agreements or

arrangements designed to protect against fluctuations in interest rate . . . entered into by

Borrower and Lender . . . in connection with the Construction Loan Documents."  (*Id.* (emphasis

added).)

By these express terms, the Loan Agreement not only references the Swap Agreement

and other swap documents, but, in fact, designates those documents as among the "Construction

Loan Documents" to which a number of the agreement's provisions refer.  By the same logic, the

Deed of Trust, which secures all of the "Construction Loan Documents" (Docket No. 11 Ex.)

includes, by definition, both the Loan Agreement and the Swap Agreement within its scope.  The

terms of the Loan Agreement thus make abundantly clear that the loan and the swap were part of

the same transaction, and, therefore, the Loan Agreement, the Swap Agreement, and the other

related documents must be construed together as the agreement between the parties.[11]  This does

not end the analysis, however.  The conclusion that the parties entered into a single transaction

---

[11]Subsequent references to the parties' "agreement" should therefore be considered to
refer collectively to the loan and swap documents unless otherwise noted.

that comprised both a loan and a swap means only that the documents must be construed together as the agreement between the parties. The court must still address the second premise of BKB's claim, which is that any swap payments that BKB was obligated to make after paying the Note constituted a penalty or premium prohibited by the Loan Agreement and that SunTrust was not entitled to refuse to remove its lien after BKB prepaid the Note.

The Loan Agreement provides that BKB "shall have the right, at any time or from time to time, to permanently prepay the Note in whole or in part, without penalty or premium."[12] (Docket No. 1 Ex., Ex. A § 2.4.) The Swap Agreement, however, provides only for termination in certain circumstances, and requires that a party that terminates the Swap Agreement early must make certain payments to the other party. (*See* Docket No. 1 Ex., Ex. C §§ 5-6.) In support of its argument that swap payments made after the Note was prepaid would constitute a prohibited penalty or premium, BKB notes that the very purpose of the swap was to fix the interest rate that BKB was to pay on the Note and that, once the Note was paid, the purpose of the swap was served, since there was no further risk to BKB of interest rate fluctuations. BKB points out that the amortization schedules of the swap and the Note were identical, such that the combined effect of the swap and the Note was to impose on BKB an obligation to pay the equivalent of a fixed rate of interest on the principal due on the Note. (*See* Docket No. 1 Ex., Ex. B at 5-7, Ex. E at 5-7.) Additionally, the Loan Agreement specifically describes hedging agreements, such as the swap, as "designed to protect against fluctuations in interest rates." (Docket No. 1 Ex., Ex. A § 1.1.) Moreover, SunTrust acknowledges that the purpose of the swap was to protect BKB against fluctuating interest rates. (Docket No. 9 at 1.)

---

[12]The Loan Agreement does not provide any further definition of the terms "penalty" or "premium."

11

However, though the purpose and practical effect of the swap may have been to provide BKB with the financial equivalent of fixed-rate financing, the terms of the agreement, taken as a whole, make clear that BKB had distinct obligations under the loan portion of the agreement and under the swap portion of the agreement—that is, BKB had an obligation to repay the Note and a separate obligation to make payments under the swap. Nowhere in the agreement does it suggest that the swap aspect of the transaction would be affected by the prepayment of the Note. Moreover, when BKB sought to prepay the Note and terminate the swap early, the amounts it owed under the terms of the swap were not the result of its prepayment of the Note but, rather, were the result of its obligations under the swap and would have been owing regardless of whether BKB prepaid the Note. Therefore, those amounts did not constitute a penalty or premium assessed as a result of BKB's prepayment of the Note. By the same logic, SunTrust was not obligated to remove its lien on the property until BKB had satisfied its obligations under the Swap Agreement, which was secured by the Deed of Trust.

The fact that these transactions constituted a single agreement that must be interpreted together does not change this conclusion, as the relevant provisions do not affect each other, and as the portion of the agreement pertaining to the swap does not contradict or otherwise alter the parties' obligations under the loan portion of the agreement. Finally, although BKB argues that the swap's termination date should have been considered irrelevant after the Note was prepaid, on the grounds that the Note also contained a termination date that was, effectively, rendered moot by the prepayment, the terms of the agreement provide no support for this argument. While, as a practical matter, BKB was not obligated to make any payments under the Note once the Note was prepaid, there is nothing in the agreement that would permit the swap's explicit termination date simply to be disregarded upon prepayment of the Note.

12

The case of *Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2002), presented similar issues to the instant case and is deserving of consideration. That case, like this one, involved two parties who had entered both an agreement for a variable-rate loan and a swap agreement that had the effect of fixing the interest rate on the loan. After the borrower declared bankruptcy, resulting in the early termination of the swap, the lender sought to collect amounts due under the swap in the bankruptcy proceeding. *Id.* at 1045. The borrower argued, however, that those amounts constituted unmatured interest disallowed under the Bankruptcy Code. *Id.* at 1046.

The *Thrifty Oil* court first noted that it was undisputed that, if the swap were a stand-alone agreement without a related loan, payments under the swap would not constitute interest at all. *Id.* at 1048. However, the borrower argued that the "coupling" of the loan with the swap "transformed the floating-rate term loan into the economic equivalent of a fixed-rate loan, thereby converting the periodic swap payments into interest." *Id.* at 1049. In addressing this argument, the court considered a hypothetical case in which a borrower entered a loan with one party and a swap with a third-party swap dealer. *Id.* at 1049. The court noted that, if a loan and swap are bifurcated as in this hypothetical, payments under the swap would not constitute interest

> even where the parties "integrate" the transaction by customizing the interest rate swap to mimic the characteristics of the loan. For example, the borrower could match the notional amounts of the interest rate swap with the principal borrowed under the loan, synchronize the two instruments' amortization and payment schedules, coordinate their respective effective and termination dates, cross-default the two instruments and provide prepayment of the loan as a termination condition under the swap. Although these contractual enhancements enable the borrower to more closely achieve its overall financing goal, they do not change the nature of the periodic payments or the termination damages due upon default. . . . The close resemblance between this arrangement and fixed-rate financing merely confirms that the borrower has successfully exploited the flexibility of a

13

derivative interest rate swap to achieve a specific financial objective. No matter
how tightly the borrower integrates the swap with its loan, the payments made
under the swap cannot represent interest.

*Id.* at 1049. However, the court went on to state that, where a single party serves as both lender

and swap dealer, the analysis is not quite as simple as in the hypothetical, as such an

arrangement "creates a theoretical possibility that the periodic swap payments form part of [the

lender's] compensation for the risk and delay associated with the term loan," raising the question

of "[w]hether, or under what circumstances, [a lender's] dual role as lender and swap dealer

converts [the borrower's] periodic swap payments from derivative cash flows into interest on the

term loan." *Id.* at 1050. The answer to this question, according to the court, "does not turn on

economic theories of interest" but rather on "equitable principles" and, in the case of *Thrifty Oil*,

which arose in the bankruptcy context, bankruptcy policy. *Id.* at 1050.

There are distinctions between this case and *Thrifty Oil* that bear mention. In *Thrifty Oil*,

the court was called on to resolve the question of whether swap payments constituted interest on

the related loan. The issue here is the related, though somewhat different, question of whether

swap payments constitute a penalty or premium under the terms of the related loan. Both issues,

however, require the court to determine the nature of the swap payments and whether those

payments are fundamentally distinct from the related loan transaction or whether they constitute

some component of the loan itself, and therefore *Thrifty Oil* provides guidance. Moreover, the

circumstances present here are very similar to those presented in the *Thrifty Oil* hypothetical, as

the parties here "integrated" the loan and the swap, tailoring the provisions of each such that the

cumulative effect, from BKB's perspective, was the financial equivalent of fixed-rate financing

on the loan. Of course, unlike the hypothetical, here the lender and the swap dealer are a single

party, and thus, as the court noted in *Thrifty Oil*, the proper characterization of the swap payments will turn on equitable principles rather than on simply economic theories of interest.

Having carefully reviewed all of the relevant documents and considered the parties' arguments, the court finds there is no basis to conclude that this is one of the "theoretical" cases in which SunTrust's role as both lender and swap dealer converts the swap payments into interest on the loan or, by extension, into a penalty or premium for prepaying the Note. The *Thrifty Oil* court noted that a situation in which a lender and a sophisticated borrower enter a standard swap agreement and in which the swap serves a legitimate purpose cannot meaningfully be distinguished from the situation posed in the hypothetical, in which the lender and the swap dealer are distinct entities.[13] *Id.* at 1053. In this case, all of these circumstances are present. BKB does not dispute that it was a sophisticated borrower, and the Swap Agreement appears to be a standard swap agreement created by the International Swap Dealers Association, as was the case in *Thrifty Oil*. Moreover, the purpose of the swap was to provide BKB with the equivalent of fixed-rate financing on the loan, protecting it from the risk of fluctuating interest rates, a purpose that the *Thrifty Oil* court found to be legitimate, noting that there are many reasons why two contracting parties might prefer to create the equivalent of fixed-rate financing through the use of a swap rather than simply through the terms of the loan itself. *Id.* at 1054 (noting that the borrower's creditworthiness and the lender's "inability to syndicate a large fixed-rate loan" were motivations for using a swap to provide the financial equivalent of fixed-rate financing).

Finally, although BKB did not respond to this aspect of SunTrust's motion, the court addresses briefly SunTrust's argument that BKB has not stated a claim for breach based on the

---

[13]Although *Thrifty Oil* was premised on bankruptcy policy, there is no reason why these factors are not relevant here.

covenant of good faith and fair dealing. The covenant of good faith and fair dealing is breached only by an action that was not in accordance with the contract's terms. *See Wallace*, 938 S.W.2d at 687 ("Performance of a contract according to its terms cannot be characterized as bad faith."). Here, the terms of the agreement expressly provided a termination date for the swap and did not provide for the swap's termination in the event that the Note was prepaid. Moreover, swap payments that BKB was obligated to make after prepaying the Note did not constitute a "penalty or premium" prohibited by the Loan Agreement, as they constituted merely BKB's satisfaction of its distinct and on-going obligation under the swap. Finally, as the Deed of Trust secured both BKB's obligations under the loan as well as its obligations under the swap, SunTrust was within its rights to refuse to remove its lien until BKB satisfied those obligations.

For these reasons, SunTrust's actions were in accordance with the terms of the contract, and BKB has not stated a claim for breach of contract.

## III.    Libel of Title

BKB also brings a claim of libel of title. (Docket No. 1 Ex. ¶¶ 15-19.) To state a claim of slander or libel of title under Tennessee law, a plaintiff must establish "(1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss." *Brooks v. Lambert*, 15 S.W.3d 482, 484 (Tenn. Ct. App. 1999) (citing *Harmon v. Shell*, No. 01-A-9211-CH-00451, 1994 Tenn. App. LEXIS 229, at *10 (Tenn. Ct. App. Apr. 27, 1994)).

SunTrust argues that BKB has failed to state a claim of libel of title because it has not alleged that SunTrust published false statements and because it has not alleged that SunTrust acted with malice. (Docket No. 9 at 13-16.) As discussed in detail *supra*, the terms of the swap

16

were such that BKB had an ongoing obligation to make swap payments even after it prepaid the Note. As the Deed of Trust secured this obligation, SunTrust was within its rights to refuse to remove its lien. Therefore, BKB's libel of title claim fails, as it has not alleged the publication of a false statement, and the court need not address SunTrust's "malice" argument.

## IV.     Tennessee Consumer Protection Act

In addition to its breach of contract and libel of title claims, BKB asserts, in the alternative, a claim under the Tennessee Consumer Protection Act (the "TCPA"). (Docket No. 1 Ex. ¶¶ 20-24.) SunTrust argues that, not only has BKB failed to establish a claim under the TCPA, but also that any such claim is time-barred. (Docket No. 9 at 16-17.) BKB admits that its claim was filed after the TCPA's statute of repose had run but argues that the continuing injury doctrine under Tennessee state law should be expanded, which would render its claim timely. (Docket No. 17 at 16-17.) Acknowledging that this proposed expansion of state law is not within the province of this court, BKB suggests that this question should instead be certified to the Tennessee Supreme Court.

The Rules of the Tennessee Supreme Court provide that a federal court may certify a question when "there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 23. Certification is appropriate "if doubt exists as to the status or application of state law," *Matthews v. Sigmon*, No. 03-2600-D, 2004 U.S. Dist. LEXIS 30139, at *7-8 (W.D. Tenn. Dec. 14, 2004) (citing *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1061 (6th Cir. 1994)), and is not appropriate where "the answer is reasonably clear," *Loveday v. Sevier County*, No. 3:98-CV-774 (Phillips), 2000 U.S. Dist. LEXIS 4017, at *6 (E.D. Tenn. Mar. 20, 2000).

17

Here, BKB fully admits that, not only does controlling precedent exist, but that its claims are time-barred under that precedent.  BKB does not argue that there is any doubt as to the law nor any intervening decisions that might call its status or application into question.  BKB's sole argument is, in effect, that it disagrees with the law as it stands.  This is not, however, a basis for certifying a question to the Tennessee Supreme Court.  Therefore, BKB's request to have the question certified will be denied, and its TCPA claim will be dismissed as time-barred.

## V.     Fraud

Finally, BKB asserts, again in the alternative to its breach of contract and libel of title claims, a claim of common law fraud.  (Docket No. 1 Ex. ¶¶ 25-30.)  To establish a claim of fraud, a plaintiff must demonstrate (1) "an intentional misrepresentation with regard to a material fact"; (2) "knowledge of the representation's falsity—that the representation was made 'knowingly' or 'without belief in its truth,' or 'recklessly' without regard to its truth or falsity"; (3) "that the plaintiff reasonably relied on the misrepresentation and suffered damage"; and (4) "that the misrepresentation relates to an existing or past fact."  *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990), *cited by Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006).[14]  SunTrust moves to dismiss BKB's fraud claim on the grounds that BKB failed to allege fraud with particularity, as required under Rule 9(b) of the Federal Rules of Civil Procedure, that BKB's reliance on SunTrust's representations was not reasonable, and that BKB's claim is barred by the parol evidence rule.  (Docket No. 9 at 18-25.)

First, BKB has alleged that SunTrust, acting either intentionally or negligently, made misrepresentations of material facts with respect to the loan with the intent that BKB rely on

---

[14]Although SunTrust cites New York law in addition to Tennessee law with respect to the fraud claim, it provides no argument as to why New York law would have any bearing here.

those misrepresentations. Specifically, BKB alleges that SunTrust represented that "the only material effect" of the swap would be to fix the interest rate on the loan and that the Swap Confirmation was "merely a confirmation of an agreement already entered into between the parties." (Docket No. 1 Ex. ¶¶ 4, 6.) These allegations provide sufficient specificity as to the "who, what, when, where, and how of the alleged fraud," *see Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quotation and citation omitted), and therefore satisfy the requirement under Rule 9(b) that fraud must be pled with particularity.

With respect to the reasonableness of BKB's reliance on SunTrust's alleged misrepresentations, SunTrust asserts that BKB, a sophisticated commercial party, had access to the Loan Agreement, the Swap Agreement, and other related documents, which clearly contradicted SunTrust's alleged misrepresentations. Although the question of reasonable reliance is generally one of fact for the jury, *J. C. Brandford & Co. v. S. Realty Partners*, No. W1999-01617-COA-R3-CV, 2000 Tenn. App. LEXIS 555, at *28 (Tenn. Ct. App. Aug. 14, 2000), SunTrust seems to argue that BKB's reliance was unreasonable as a matter of law.

While BKB was certainly a relatively sophisticated party, this hardly appears to have been a transaction between equals, given the complexity of the swap, the fact that SunTrust suggested this complex transaction in response to BKB's simple request for fixed-rate financing, and the fact that SunTrust was, by all appearances, far more familiar with the technicalities of swap transactions generally. Although SunTrust relies on *Solomon v. First American National Bank*, 774 S.W.2d 935 (Tenn. Ct. App. 1989), for the proposition that BKB cannot establish a fraud claim when it had ready access to the unambiguous contracts that it signed, the court does not find *Solomon* especially persuasive. In *Solomon*, the plaintiff alleged that a bank officer orally limited the plaintiff's liability on a $40,000 guaranty to $10,000, and the court reversed a

19

verdict for the plaintiff, noting that the $40,000 face amount of the guaranty was "obvious to any literate person." *Id.* at 943. Here, not only is the agreement far more complex and far less susceptible to being understood by "any literate person," but also BKB's fraud allegation is far more nuanced, and the misrepresentations that BKB alleges go not just to the face of the agreement but, rather, to the implications of various instruments and their individual and cumulative effects on the transaction as a whole. Moreover, the court notes that SunTrust did not provide BKB with the Swap Confirmation until after the rest of the documents had been executed, and then represented that the confirmation was merely a restatement of those documents when, in fact, it contained significant additional terms, demonstrating that BKB's allegation of fraud goes well beyond a mere disavowal of the contract itself. Therefore, the question of whether BKB reasonably relied on SunTrust's alleged misrepresentations is one of fact that may not be resolved on a motion to dismiss.

Finally, SunTrust argues that BKB's fraud claim is barred by the parol evidence rule. Under Tennessee law, "parol evidence is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete and unambiguous, absent fraud or mistake or any claim or allegations thereof." *Airline Constr. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990). However, the parol evidence rule applies only to contract claims and does not apply where a plaintiff alleges a fraudulent misrepresentation that induced that contract. *E.g.*, *Lipford v. First Family Fin. Servs.*, No. W2003-01208-COA-R3-CV, 2004 Tenn. App. LEXIS 297, at * 12 (Tenn. Ct. App. Apr. 29, 2004); *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 588 (Tenn. Ct. App. 1980) (citing *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 231 (Tenn. Ct. App. 1977)); *see also Power & Tel. Supply*, 447 F.3d at 931 n.4 (citing *Lipford* for the proposition that the parol evidence rule "does not apply to claims of

20

fraudulent misrepresentation inducing a contract"). SunTrust argues that these cases are not relevant, as they did not involve sophisticated commercial parties such as BKB. There is no reason to believe that those cases are so limited, however. Moreover, as discussed above, there existed a notable imbalance between the parties that cannot be ignored. Additionally, although SunTrust argues that the fraud exception to the parol evidence rule is limited to subject matter that does not contradict or vary the terms of the contract, citing *Harry J. Whelchel Co. v. Ripley Tractor Co.*, 900 S.W.2d 691 (Tenn. Ct. App. 1995), and *Farmers & Merchants Bank v. Petty*, 664 S.W.2d 77 (Tenn. Ct. App. 1983), neither case is persuasive, as both, like *Solomon*, involved representations that essentially disavowed the entire contractual obligation and amounted to little more than the defendant's oral promise that the contracting party would not be obligated by the contract he was about to enter. BKB's allegation of fraud, by contrast, is not that SunTrust simply disavowed the contractual obligation as a whole, but that SunTrust misled BKB with respect to both the contents of and interaction among the various documents that comprised the loan and swap transaction.

Therefore, SunTrust's motion to dismiss BKB's fraud claim will be denied.

## CONCLUSION

For the reasons discussed herein, the Motion to Dismiss filed by the defendant will be granted with respect to the plaintiff's breach of contract, libel of title, and Tennessee Consumer Protection Act claims, and denied with respect to the plaintiff's fraud claim. An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

21