IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BKB PROPERTIES, LLC,           )
                               )
    Plaintiff,                 )
                               )
v.                             )    Case No. 3:08-cv-00529
                               )    Judge Trauger
SUNTRUST BANK,                 )
                               )
    Defendant.                 )

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the defendant SunTrust Bank ("SunTrust") (Docket No. 38), which seeks summary judgment on the plaintiff's lone remaining claim in this case, that is, common law fraud. For the reasons discussed herein, the defendant's motion will be granted, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a loan that the defendant SunTrust made to the plaintiff, BKB Properties, LLC ("BKB"), to finance the construction of a car dealership.[1] BKB is a property holding company based in Nashville, Tennessee, and SunTrust is a large banking institution based in Atlanta, Georgia, specializing, among other things, in commercial lending. Bruce

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 40 and 46) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

Burnett, who is a major player in this case, is the managing partner of BKB.

In 1991, along with his father, Burnett purchased a Mercedes-Benz automobile dealership out of the Bankruptcy Court in this district. Burnett became the general manager of the dealership, which was known as Middle Tennessee Motorcars, Inc. ("MTMC"). The dealership was located at 535 Murfreesboro Road in Nashville, and MTMC operated at that location for several years. SunTrust provided some, but not all, of MTMC's banking services.

In 2000, Burnett began examining financing options in conjunction with a planned move from the Murfreesboro Road location to a new location in Cool Springs in Williamson County, Tennessee. Burnett intended to receive three loans in conjunction with the move, that is, a construction loan payable to BKB to finance construction of the dealership, along with loans, payable to MTMC, for the "floor plan" of the dealership and for "working capital" to be used during the period of transition. The terms of the construction loan to BKB are at the heart of this dispute.

In late 2000, Burnett was contacted by Vickie Manning, a "relationship manager" at SunTrust, to discuss Burnett's needs in terms of financing for the move. While the initial conversations between Manning and Burnett were of the "meet and greet" variety, SunTrust (through Manning) and BKB (through Burnett) soon began to have serious discussions about financing the move, including specific discussions about how much capital would be required and about how interest rates would be structured. At some point, Burnett made a specific proposal for a twenty-year fixed rate loan for approximately $10,000,000 to finance the construction of the dealership, along with separate loans to finance the floor plan and the working capital.

2

After discussing Burnett's proposal with other decision makers at SunTrust, Manning conveyed to Burnett that a fixed rate would not be possible on a loan that was anywhere near the length of time that Burnett was proposing, that is, even a ten-year loan could not be maintained with a fixed interest rate. At this point, which was toward the end of 2001, Manning suggested an alternative way to fix the interest rate on the construction loan; that is, through SunTrust Capital Markets and its subsidiary, SunTrust Robinson Humphrey, SunTrust could make available an interest rate "swap" contract.

Under a swap arrangement like the one Manning proposed, the borrower would still pay the lender interest, at a variable rate, tied to the world financial markets, on the primary construction loan. (Docket No. 44 at 2.) Additionally, the borrower would pay the lender interest on the principal amount at a fixed rate set at the inception of the swap agreement. (Docket No. 42 at 1.) Also, the lender would pay the borrower interest at the same variable rate on the same principal. (*Id.*) If the primary loan is not terminated before its maturity, the net effect of the swap agreement is that the borrower pays a fixed rate on the construction note for the entire term of the loan, with the parties essentially swapping variable rate interest payments. An issue arises, however, when the borrower pays off the principal before the maturity of the loan.

As has been well publicized of late, derivative transactions such as swap agreements are exceedingly complex and difficult to explain. Anything more than a basic understanding of the consequences of principal loan pre-payment under a typical swap agreement is not necessary here. That is, under a typical swap agreement, if interest rates have gone down between the execution of the swap agreement and the date of pre-payment on the principal loan, the borrower

3

must pay a penalty to make the bank whole.[2] As the plaintiff helpfully summarizes in its brief, "the termination 'fee' under the parties' swap agreement required BKB to pay the market value of the difference between the fixed [rate] it was paying to Suntrust and the lower variable rate that Suntrust was paying to BKB for the remaining term of the swap agreement." (Docket No. 44 at 4.) If interest rates go up during the period between the execution of the swap agreement and pre-payment on the principal loan, then "the swap contract has market value to the borrower which can be realized." (Docket No. 42 at 2.)

The parties dispute the degree to which SunTrust apprised BKB of the details and consequences of swap agreements. In her affidavit and in her deposition, Manning contends that she advised Burnett that one of the potential disadvantages of the swap agreement was that terminating the transaction prematurely could potentially mean that Burnett would be required to pay a fee. (*See* Docket No. 47 Ex. 2 at 36.) Burnett, on the other hand, claims that he was never told that a substantial pre-payment fee is a potential consequence of a swap agreement. Indeed, in his affidavit filed in conjunction with summary judgment briefing, Burnett states that, "Manning [] told me that the only effect of a swap agreement would be to fix the interest rate on the loan. I do not specifically remember at which meeting Manning made this representation, and I do not recall the exact words she used. But I do specifically remember Manning making this statement." (Docket No. 45 at 1-2.) In her deposition, Manning testified that it is "not possible" that she told Burnett that the "only effect" of the swap agreement was to fix the interest rate, and that she is "absolutely certain" that she did not make such a statement or any statement

---

[2]This penalty is euphemistically referred to as "unwinding the swap." (Docket No. 42 at 2.)

4

that could have given Burnett such an impression. (Docket No. 47 Ex. 2 at 36-37.)

Given the complexity of the transaction and the length of the negotiations, there is a surprising lack of documentation to support the claims on either side. It is also notable that Burnett's deposition testimony, in which he repeatedly professed a lack of memory regarding his swap agreement discussions with Manning, is entirely inconsistent with the certitude that he shows in his affidavit. Burnett apparently also submitted errata sheets to SunTrust in which he attempted to clarify his deposition testimony and make clear that Manning, at some point, had made the "only effect" statement.

SunTrust has submitted an October 29, 2001 letter from Manning to Burnett, in which Manning broadly discusses the potential swap agreements and primary loan terms that the parties had apparently talked about a few days earlier. (Docket No. 41 Ex. 1.) The letter discusses that, through a swap agreement, the interest rate on the construction loan could be, in essence, fixed for the length of the swap agreement (which could be either ten or twenty years), and Manning suggests that, if BKB does not anticipate prepaying the loan, it should consider the longer loan period. (*Id.*) SunTrust maintains that this letter shows that Manning had at least raised the connection between swap agreements and prepayment with Burnett during the course of their discussions.

After negotiations progressed further, SunTrust prepared a formal commitment letter dated February 13, 2002, which outlined the terms of the proposed credit arrangements in further detail. The commitment letter proposed, among other things, a construction loan to BKB of $6,960,000.00, with a variable interest rate and a related ten-year interest rate swap, which, again, in essence, would fix the interest rate for that ten-year period. Specifically, the

5

commitment letter stated, "loan rate will be hedged with a ten-year swap priced at the bank's all in cost plus 175 basis points." (Docket No. 42 Ex. 1 at 1.) Burnett signed the commitment letter on February 14, 2002, agreeing to the terms of the letter and authorizing SunTrust to proceed with the "documentation of the loan." (Docket No. 42 Ex. 1. at 2.)

SunTrust has also submitted a February 21, 2002 e-mail from Ken Kuykendall, a Vice President at SunTrust Capital Markets, to BKB's controller, Ellis Hubbard, that purports to attach various draft swap agreement documents and disclaimers, including the Master Agreement and the schedule to the Master Agreement. (Docket No. 42 Ex. 4.) The plaintiff argues that there is no proof that this e-mail actually attached any documents and contends that "BKB did not receive" these documents prior to the closing of the primary construction loan. (Docket No. 46 at 7.)

The closing of the primary construction loan occurred on March 12, 2002. According to his deposition, a day or two after closing, Hubbard received a phone call from a SunTrust representative (Hubbard does not recall who it was) who informed Hubbard that SunTrust would fax over documents that were necessary to confirm the agreements that SunTrust and BKB had already reached. (Docket No. 38 Ex. 2 at 43-44.) The document faxed from SunTrust to BKB was a Confirmation of Interest Rate Transaction. The Confirmation prominently stated that "this letter agreement should be reviewed, executed by an authorized person(s) and returned immediately" to SunTrust. The Confirmation also prominently stated that any questions about the document should be directed to Ken Kuykendall at SunTrust Capital Markets.

The Confirmation outlined the basic terms of the swap agreement, providing for the same ten-year term as stated in the commitment letter, along with providing the fixed interest rate and

6

the amortization schedule. (Docket No. 43 Ex. 4 at 2.) The Confirmation also clearly envisions that the Master Agreement, which provides additional detail as to the workings of the swap agreement, will be signed subsequent to the signing of the Confirmation. (*Id.* at 1.) The Confirmation also contained numerous disclaimers, and, according to the terms of the Confirmation, signing the Confirmation indicated that the borrower understood the risks of entering into the transaction, including "the risk that the transaction may increase or decrease in value with a change in, among other things, interest rates." (*Id.* at 4.) A signature on the Confirmation also indicated that the borrower had read the attached Terms of Dealing and Risk Disclosure Statement that contained numerous similar cautionary provisos, which, among other things, disclaimed any fiduciary relationship between SunTrust and the borrower and repeatedly cautioned the borrower to understand the inherent risks of the transaction before entering into the agreement. (Docket No. 42 Ex. 4 at 8-9.) According to his deposition, Hubbard, after a brief review of the Confirmation with Burnett, signed the Confirmation and returned it to SunTrust by fax on March 14, 2002. (Docket No. 38 Ex. 2 at 44.)

On March 25, 2002, SunTrust sent executed copies of the Master Agreement and Schedule to BKB for BKB to review and sign. This time, there is no dispute about whether BKB received these materials. Burnett acknowledges receiving, reading, signing and finally returning the Master Agreement to SunTrust on March 27, 2002. At the same time, Burnett also executed corporate resolutions authorizing Burnett to enter into derivative transactions on behalf of BKB, and copies of those documents were delivered to SunTrust as well.

Section 6 of the Master Agreement discusses fees and costs associated with "Early Termination." (*See* Docket No. 43 Ex. 6 at 8-10.) It is worth noting that issues of contractual

7

interpretation are not presently before the court; that is, the only claim still pending in this matter is BKB's claim that SunTrust fraudulently induced BKB into entering this agreement. Therefore, it is not necessary to mine the depths of the Master Agreement in order to determine BKB's obligations thereunder. That said, the Master Agreement, to say the least, is not easy to understand. It is more than two dozen pages, single spaced, with a plethora of defined terms and internal cross references. Suffice it to say that it would take a highly educated person many hours of careful study to fully understand the meaning and ramifications of the entire Master Agreement. As noted above, Burnett signed and returned the Master Agreement to SunTrust within two days of receiving it.

Because the corporate resolutions that Burnett returned to SunTrust on March 27, 2002 listed Burnett as the BKB representative authorized to enter into derivative transactions on behalf of BKB, the Confirmation, which, as noted above, had been originally signed by Hubbard, needed to be signed by Burnett. Therefore, on April 8, 2002, SunTrust sent another copy of the Confirmation to BKB, which Burnett signed and then returned to SunTrust. This completed the process of executing the swap agreement, and, thereafter, BKB began receiving separate invoices for interest payments due under the primary construction loan and under the swap agreement. Each invoice for the swap agreement recited the principal terms of the swap agreement and reiterated that the termination date of the swap agreement was March 15, 2012.

In March 2007, Burnett approached Joe Walker at SunTrust about paying off the primary construction loan. Burnett claims that, at that time, he believed that he had the right to "call the loan and swap agreement at five year intervals," that is, pay off the swap agreement and the

8

construction loan early without any penalties.[3] Walker advised Burnett that this was not the case, that the swap agreement was for ten years, and that, because interest rates had plunged since the parties had entered into the swap agreement, it would cost BKB a substantial amount of money to "unwind the swap" prior to the loan maturity date.

Upset about this turn of events, BKB filed a lawsuit in Davidson County Chancery Court on April 14, 2008, asserting claims for breach of contract, libel of title, and alternative claims for violations of the Tennessee Consumer Protection Act (TCPA) and fraud. (Docket No. 1 Ex. 1.) After the filing of the Complaint, the defendant removed this case to this court and the parties entered into an agreement in which the swap was terminated early, BKB paid the early termination amount and reserved all of its rights in this action.

Shortly after removal, SunTrust filed a Motion to Dismiss BKB's Complaint in its entirety. The court granted the motion as to the breach of contract, libel, and TCPA claims but concluded that BKB had sufficiently pled a claim for fraud. (Docket No. 29.) Following discovery in this matter, SunTrust now seeks summary judgment on the fraud claim.

## ANALYSIS

Following the dismissal of most of its claims in this case, the plaintiff, BKB, asserts a single claim of fraud under Tennessee law, alleging that the defendant, SunTrust, through statements of its representatives, fraudulently induced the plaintiff to enter into the swap agreement. SunTrust has moved for summary judgment on that claim, arguing that there is no credible evidence that misrepresentations were made and, even if such misrepresentations were

---

[3] Burnett may have had this impression because of language in the commitment letter and elsewhere that discussed potential "credit calls" for the primary construction loan every five years. (Docket No. 42 Ex. 1 at 2.)

9

made, any reliance on those statements is unreasonable as a matter of law.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla

of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49.

## II.   Fraud Claim

To establish a claim of fraud under Tennessee law, a plaintiff must demonstrate that (1) the defendant made an intentional misrepresentation with regard to a material fact; (2) that the defendant acted knowingly or recklessly in making the statement; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage and (4) that the misrepresentation relates to an existing or past fact. *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990). The court is not at liberty to presume any of the elements of fraud, and the plaintiff must come forward with sufficient evidence at this stage to at least raise a genuine issue of material fact as to each element. *Crouch v. Bridge Terminal Transport, Inc.*, 2002 WL 772998, *5 (Tenn. Ct. App. Apr. 30, 2002). Moreover, non-specific and vague allegations as to the content of the alleged misrepresentation are disfavored, and it is well established that, particularly as the litigation moves beyond the pleading stage, the plaintiff should be able to identify the "time, place, and content" of the misrepresentation. *Power & Telephone Supply Co.,*

11

*Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006); *Sanderson v. HCA-The HealthCare Co.*, 447 F.3d 873, 876 (6th Cir. 2006).

SunTrust argues that the plaintiff cannot sufficiently establish that an intentional misrepresentation was made or that the plaintiff reasonably relied on that misrepresentation. (Docket No. 39 at 9-10.) The plaintiff argues that there are two statements that could form the basis for the fraud claim, that is, Manning's statement that the "only effect" of the swap agreement would be to fix the interest rate on the loan and the statement by an unidentified SunTrust representative to Hubbard, which was, as Hubbard put it, something to the effect of that the Confirmation "was just a document that was to confirm some of the provisions that had already been previously agreed to, and that it just needed to be signed to consummate the loan agreement." (Docket No. 38 Ex. 2 at 43-44; Docket No. 44 at 1-2.) For reasons made clear below, neither of these statements can form the basis for the fraud claim.

### A. Manning's "only effect" statement

First, as to Manning's statement, it is certainly notable that, during the course of his lengthy deposition, the transcript for which is 166 pages, Burnett never mentioned that this statement was made. (Docket No. 38 Ex. 1.) Rather, time and again, Burnett disclaimed any substantive memory of his conversations with Manning, and he stated that he would be unable to counter statements Manning might make about the substance of their negotiations because he simply did not remember the negotiations well enough. (*See id.* at 47-57.)

Conveniently, following his deposition, Burnett, apparently without an explanation, submitted an errata sheet to SunTrust, which sought to amend his deposition answers to reflect

12

that Manning made the "only effect" statement.[4] (Docket No. 45 at 5-6.) Moreover, in his declaration filed in conjunction with the briefing on this motion, Burnett claims that Manning, at some point, told Burnett "that the only effect of a swap agreement would be to fix the interest rate on the loan." (*Id*. at 1-2.) Burnett cautions that he does "not specifically remember at which meeting Manning made this representation," and he does "not recall the exact words she used," but he remembers "Manning making this statement." (*Id.*)

Generally, absent a persuasive explanation, the non-moving party cannot create an issue of fact by submitting, after the summary judgment motion is filed, an affidavit that directly contradicts prior sworn deposition testimony. *Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 908-09 (6th Cir. 2006). Other courts have also concluded that errata sheets that, without explanation, seek to substantively change deposition testimony should not be given significant weight. *See Wyeth v. Lupin Ltd*., 252 F.R.D. 295, 296 (D. Md. 2008); *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992). The defendant argues that Burnett's *post facto* efforts to supplement his testimony should, therefore, be disregarded.

It is not necessary to resolve whether or not Burnett's declaration and errata sheets should be disregarded based on the standards above. The statement that Burnett attributes to Manning is so vague and non-specific as to the time, place, manner, and, perhaps most importantly, context of the statement, that the "only effect" statement simply cannot constitute an "intentional misrepresentation" for purposes of the plaintiff's fraud claim at this stage in the proceedings. *See Simms v. CIT Group/Consumer Finance*, 2009 WL 973011, *8 (W.D. Tenn. Apr. 9, 2009)(statements that were "vague" and "lacking in specificity" were not a viable basis

---

[4]This errata sheet has not been made a part of the record.

13

for afraud claim). Indeed, depending on the context in which the "only effect" statement was made, the statement could be true. For instance, if at the time of the statement, the parties were discussing the swap agreements' impact on the overall interest rate on the primary loan, the statement that "the only effect" of the swap agreement would be to fix the interest rate would be accurate. In sum, the plaintiff has simply failed to connect the "only effect" statement to the context of pre-payment penalties, as would be necessary for the statement to carry an element of untruth or misrepresentation.

Moreover, the defendant has come forth with evidence indicating that Manning did not leave Burnett with the impression that the swap agreement had only a single consequence, that is, to fix the interest rate. In her deposition, Manning stated that she was "absolutely certain" that she did not leave this impression with Burnett, and she testified that she specifically remembered warning Burnett of the risk of pre-payment on the primary loan. (Docket No. 47 Ex. 2 at 36-37.) Consistent with this, in the October 29, 2001 letter from Manning to Burnett, Manning references the fact that, if Burnett does not intend to prepay the loan, he should consider a longer-term swap agreement. (Docket No. 41 Ex. 1.) While this does not conclusively prove that Manning clearly explained the potential prepayment consequences to Burnett, it does indicate that Manning's conversations with Burnett about the swap agreement likely connected swap agreements and pre-payment penalties, and, certainly, were of more substance than Manning simply stating that the "only effect" – across the board – of the swap agreement was to fix the interest rate.

Even if this statement was made and did constitute an intentional misrepresentation, the plaintiff has failed to sufficiently show reasonable reliance. First of all, while there is little

14

documentary evidence of the negotiation, there is no question that these negotiations continued over a period of months and, at various points, involved senior individuals in the Capital Markets group at SunTrust, who were significantly more experienced in handling swap agreements than Manning was. In this context of an obviously complex and financially weighty transaction, it is simply untenable for Burnett, as a sophisticated businessperson, to claim that he could have reasonably relied on a single statement made – at some point in an unknown context – by Manning about the "only effect" of the swap agreement   The un-tenability of this position is further demonstrated by the fact that, during his deposition, Burnett testified that he did not believe that Manning understood the concept of swaps, and that only a "very specialized group of investors, of financial guys ... understand what that's all about." (Docket No. 38 Ex. 1 at 96-97.)

Moreover, while there is some dispute as to whether BKB received draft copies of the Master Agreement prior to closing, there is no question that BKB received a copy of the Master Agreement and Confirmation, had time to review those documents, and signed them, thereby binding BKB to the swap agreement. Those documents make it abundantly clear that the swap agreement has considerable consequences and risks beyond simply fixing the interest rate; indeed, as discussed above, the Master Agreement has a lengthy and detailed discussion of the consequences of early termination and the Confirmation mentions that the value of the transaction is tied to changes in interest rates in the market. These documents contain numerous disclaimers warning the borrower that there are significant risks of entering into the swap agreement and the agreement should not be signed without understanding those risks.

The general rule in Tennessee is that parol evidence "proof of fraud in the inducement or promissory fraud is limited to subject matter which does not contradict or vary the terms that are

15

plainly expressed in the written contract." *Burton v. Hardwood Pallets, Inc.*, 2004 WL 572350, *2 (Tenn. Ct. App. March 22, 2004). That is, while each case presents somewhat different circumstances and consideration is often made of the sophistication of the parties, it is generally unreasonable to rely on previous oral statements that are plainly contradicted by the language in the contract. *See id; Shah*, 338 F.3d at 568. Here, the detail and scope of the Confirmation and Master Agreement plainly contradict any simplistic statement made by Manning that the "only effect" of the swap agreement was to fix the interest rate. Moreover, BKB is a corporate entity that was represented by counsel during these negotiations and was attempting to finance a multi-million dollar transaction. That is, BKB was clearly sophisticated enough to understand that the contracts contradicted any simplistic earlier statement.[5]

For all of the reasons discussed above, the Manning comment cannot form the basis of the plaintiff's fraud claim here. The statement, as alleged, is too vague and non-specific. Moreover, Burnett's own testimony and the contract documents clearly show that any reliance on that statement would be unreasonable.

### B. The Un-attributed Statement Reported by Hubbard

Similar issues exist with regard to the statement that Hubbard claims that an unnamed

---

[5] Burnett claims that his counsel never saw the swap agreement documents, which SunTrust sent directly to BKB following the closing of the primary construction loan. Burnett claims that he had instructed SunTrust to send all documents related to the loan transaction to his counsel, and, therefore, he assumed that any material SunTrust sent to him was also being sent to his counsel, who would have alerted him if there was a problem. (Docket No. 38 Ex. 1 at 104-108; Docket No. 45 at 3.) There is no indication from this testimony that SunTrust affirmatively promised to direct all correspondence to BKB to BKB's counsel or told Burnett or anyone else at BKB that the swap agreements had been conveyed to BKB's counsel. (*Id.*) Burnett apparently signed and returned the swap agreement documents without reviewing them or any of his assumptions with his counsel, a fairly reckless act for which SunTrust can in no way be held responsible. (*Id.*)

16

SunTrust representative made to him, that is, that the Confirmation simply memorialized previous agreements that had already been reached. (Docket No. 38 Ex. 2 at 43-44.) As a potential basis for a fraud claim, this statement fails on almost every level. First, because the statement is so vague, it is not really possible to say that the statement is untrue. For instance, through the commitment letter, the parties had already agreed that they would engage in a ten-year fixed rate swap agreement, and the Confirmation memorialized that. There is no indication from the record that the terms of the Confirmation directly contradict terms that had been agreed to in a previous negotiation or document. Moreover, even if the statement did amount to an intentional misrepresentation, the plaintiffs' inability to identify who made the statement essentially eliminates any evidence as to the intent of that individual. Also, again, even if the statement is untrue, any reliance on the statement would clearly be unreasonable in light of the detailed and clear terms of the agreement as described in the Confirmation.

### C. Additional Points

The plaintiff also notes that, in its Complaint, it alleged "constructive fraud," which the plaintiff refers to as "negligent" fraud or fraud "without the element of intent." (Docket No. 1 Ex. 1 at 7; Docket No. 44 at 12, citing *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 39 n. 8 (Tenn. Ct. App. 2006)). A claim of constructive fraud is generally appropriate where there is a relationship of "confidence and trust" between the parties. *See Ralston v. Hobbs*, 2009 WL 1564798, *8 (Tenn. Ct. App. June 4, 2009) (internal quotation omitted). Here, given the repeated disclaimers of a fiduciary relationship, the arm's length nature of the transaction, and the fact that lawyers represented parties on both sides, a relationship of "confidence and trust" is simply not implicated here. Moreover, as is clear from the discussion above, "intent" is not the most problematic issue for the plaintiff; even if the plaintiff did not have to demonstrate intent, it

17

still could not establish a claim because of the vagueness of the purported statements and the unreasonable nature of any reliance.

The plaintiff also repeatedly emphasizes how unfair this swap agreement was, and how, if individuals from SunTrust had ever fully explained the potential ramifications of the agreement, BKB would not have entered into the transaction. (*See* Docket No. 45 at 2; Docket No. 44 at 6.) Despite the fact that the swap agreement documents were littered with cautionary disclaimers, the court is not wholly unsympathetic to this position, as it does seem that all of the confusing and protracted details of the swap agreement may well have not been disclosed to BKB until after closing on the primary loan, and the swap agreement itself is extremely complicated and difficult to understand. That being said, there is still no evidence of fraud, only yet another lesson that individuals and entities should fully understand the ramifications of the agreements that they sign before doing so.

Finally, the plaintiff cites the fact that this court previously denied the defendant's Motion to Dismiss the fraud claim. (*See* Docket No. 44 at 15.) At the motion to dismiss stage, the court concluded that the plaintiff had sufficiently pled a misrepresentation, and the issue of reliance was "one of fact that *may not be resolved on a motion to dismiss.*" (Docket No. 28 at 20.)(emphasis added). As discussed in detail above, for the summary judgment stage, the plaintiff's allegations as to the alleged misrepresentations are untenably vague, and discovery and further briefing has shown that the plaintiff was a sophisticated party, represented by counsel, who, as a matter of law, could not have reasonably relied on the purported misrepresentations in light of documents that would have starkly and obviously contrasted with the substance of any such misrepresentation.

18

## CONCLUSION

For the reasons discussed above, the defendant's Motion for Summary Judgment will be granted and this case will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge